IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | 21-CR-00485-BAH |
| KERRY WAYNE PERSICK | § § | |

<u>**DEFENDANT'S SENTENCING MEMORANDUM**</u>

To the Honorable Judge of this Court:

Kerry Wayne Persick, Defendant, by and through his attorney of record, files the following sentencing memorandum that sets forth all factors that this Court should consider in determining what type and length of sentence is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a). Due to Kerry's character and the circumstances and his very limited role in this historic event, Kerry asks this Court to sentence him to a probationary term.

1. **Principles of Law**

    a. **Non-Guideline Sentencing**

Typically, in determining a just sentence, district courts must first calculate the guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, explaining any variance from the former with reference to the latter. 18 U.S.C. § 3553(a). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Because the guidelines do not apply in this case, this Court must look to the factors listed in § 3553(a) in determining a just sentence.

    b. **Section 3553(a)**

1

Section 3553(a) directs sentencing courts to impose a sentence sufficient, but not greater than necessary, to comply with the following purposes:

    i. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    ii. to afford adequate deterrence to criminal conduct;

    iii. to protect the public from further crimes of the defendant; and

    iv. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

In determining the minimally sufficient sentence, §3553(a) further directs sentencing courts to consider:

    i. the nature and circumstances of the offense and the history and characteristics of the defendant §3553(a)(1);

    ii. the kinds of sentences available §3553(a)(3);

    iii. the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct §3553(a)(6); and

    iv. the need to provide restitution to any victims of the offense. §3553(a)(7).

In sum, in every case, a sentencing court must consider *all* of the §3553(a) factors, not just the guidelines, in determining a sentence that is sufficient—but not greater than necessary—to meet the goals of sentencing. And where the guidelines conflict with other sentencing factors set forth in §3553(a), these statutory sentencing factors should generally trump the guidelines. *See United States v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part, dissenting in part) (arguing that since §3553(a) requires a sentence be no greater than necessary to meet four purposes of sentencing, imposition of sentence greater than necessary to

meet those purposes violates statute and is reversible, even if within guideline range).

### c. Information to be Used at Sentencing

Under 18 U.S.C. §3661, "*no limitation* shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (emphasis added).

## II. Sentencing Factors

Kerry urges this Court to consider factors and circumstances that make him suitable for a probationary term. The offense that Kerry pleaded guilty to carries a maximum sentence of six months' imprisonment or a term or probation not to exceed five years and a fine of not more than $5,000. *See* 40 U.S.C. § 5109(b); 18 U.S.C. § 3571(b)(6). Pursuant to U.S.S.G. § 1B1.9, the sentencing guidelines do not apply to this sentencing.

### a. Nature and circumstances of the offense

#### i. Chaos surrounding January 6

Then-President Donald Trump told the American people that the 2020 presidential election was rigged. Despite knowing there was no credible evidence to support this claim, he engaged in a massive effort to spread lies about the election. As a result, supporters, including members of Congress, republican state representatives and attorneys general spread those lies through social media posts and by using sensationalists on major "news" outlets. Shockingly, this effort was effective, and seemingly respectable congressman and individuals bought in to this dangerous rhetoric. What followed were numerous, frivolous lawsuits that were aimed at continuing the Trump camp's web of lies. While countless individuals showed their support for this movement online, others planned to attend Trump's "Save America" rally in Washington

D.C. on January 6, 2021. Thousands showed up to the Ellipse early that morning dressed in MAGA attire. Several groups of attendees did not attend this rally for political speech, however, and for this group, there was clearly a plan. As Liz Cheney stated during the first day of the January 6th committee hearings, "President Trump summoned the mob, assembled the mob, and lit the flame of this attack." We now know that Trump was warned of the potential violence and not only encouraged it, but also wanted to participate. And as a result, extremist groups, unknown to Kerry, came dressed in military-grade attire wearing ballistic helmets and body armor with a single purpose: to attack the Capitol.

Trump began his speech at the Ellipse at 11:57 a.m. He asked Vice President Mike Pence to do the "right thing" and help them win the election, or else it would be "a sad, sad day for [the] country." At around 12:45 p.m., law enforcement officials were sent to investigate reports of a pipe bomb found near the Republican National Committee headquarters and suspicious packages found near the Democratic National headquarters. Simultaneously, members of the crowd began to make its way to the Capitol traveling straight up Pennsylvania Avenue. Law enforcement officials began to recognize the growing crowd of protesters that was getting closer and closer to the Capitol. Shortly thereafter, Trump ended his speech with: "If you don't fight like hell, you're not going to have a country anymore… We are going to walk down Pennsylvania Avenue . . . and we are going to the Capitol." Encouraged on by their leader, the rioters pushed past barriers and law enforcement and breached the Capitol's walls. What happened next will go down in U.S. history books as a tragic day for American democracy.

## ii. Kerry's limited participation in the January 6th events

On January 5, 2021, Kerry Persick flew from his home in Texas, to Washington D.C. to

attend President Trump's rally at the Ellipse. He traveled alone. Kerry had never attended a Trump event before. Though his family urged him to meet others going to the rally for safety reasons, Kerry mainly stayed to himself. Because Kerry's only plan while in Washington D.C. was to attend the rally, he checked into his hotel chosen for its prime location near the Ellipse.

The next day, January 6, 2021, Kerry attended the rally, a face amongst tens of thousands. But Kerry wasn't "in" on the plan—he did not have any idea that he'd be walking up Pennsylvania Avenue later that afternoon. For Kerry, it wasn't until near the end of the rally, when Trump and individuals in the crowd remarked that they were going to head towards the Capitol. Kerry decided to go along with the crowd down Pennsylvania Avenue and ended up in front of the Capitol around 2:00 p.m. As everyone around him was encroaching on the Capitol entrances, Kerry entered the building through an opened Senate Wing Door as part of the crowd. The door he entered through had been breached approximately 20 minutes before Kerry crossed the threshold. Kerry remained inside the Capitol building for approximately 18 minutes, looking around, taking pictures and videos. He never saw violence, nor participated in violence. In fact, he didn't know the full extent of what was going on until his wife called and asked if he was inside the Capitol. Mrs. Persick stated she was watching the events unfold on television, and he needed to get out immediately. Kerry then attempted to find the quickest way out. He was eventually directed by law enforcement to exit through a broken window near the same area he entered the Capitol. He walked away from the Capitol premises and returned to his hotel. Kerry left Washington D.C. the next day as planned.

On April 4, 2022, Kerry pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). Kerry decided to attend the rally

because he wanted to be a face in the crowd and assert his First Amendment right to free speech. He never advertised that he was attending the rally in advance, nor posted a single tweet, image, or video about the events of January 6th or the presidential election. He is not associated or affiliated with any groups or individuals that encourage the type of violence and rioting that took place on January 6th. He did not engage with the false rhetoric that continues to swirl around the events of January 6th by President Trump, the media, or the slew of Republican politicians. He did not use the type of violent language found amongst others involved on January 6th nor incite further dissent. Instead, Kerry simply returned to work and has continued to be a useful part of society.

After the FBI received a tip that Kerry was present in the Capitol, they interviewed a witness on March 2, 2021. This individual stated that they were an acquaintance of Kerry and also stated that they did not see any Facebook posts from Kerry about January 6, were surprised that Kerry attended, and described Kerry as "not a radical guy" and a" smart guy" who probably realized he made a mistake. Most importantly, they stated this is not common behavior for Kerry.

Once Kerry was contacted by federal agents regarding his involvement in these events, he fully cooperated with authorities. When it came time to turn himself in to custody, he did so voluntarily. By quickly pleading guilty, he has fully admitted to his wrongdoing in stepping foot inside the Capitol on January 6, 2022.

    b. **History and Characteristics of the Defendant**

Kerry is a 42-year-old man born and raised in Texas. He has been with his wife, since high school. After taking care of himself and his sibling as a teenager due to his parents' contentious custody battle, Kerry graduated from high school in Wichita Falls, Texas, before

attending college at Midwestern State University. A few years after graduating from college, Kerry attended the University of North Texas to earn his Master of Business Administration in Finance.

Kerry works at an investment firm, as he has consistently for the majority of his adult life. He has remained fully employed and continued to work throughout this pending case. Kerry has no criminal history. He has abided by all conditions of pretrial release. There is no doubt that he will be successful on probation. He owns a home with his wife in Texas. Kerry and his wife are very active in their church and serve as mentors to married couples. Outside of work and his church, Kerry volunteers in his community and makes regular visits to the homeless to bring groceries and assist with whatever is needed that week. He frequently helps out other neighbors, hosts friends for cookouts, and serves as a leader to those around him.

Kerry's wife, the couple's close friends, neighbors, and relatives are aware of this current case and remain in full support of Kerry. Well over a dozen individuals have submitted letters describing specific instances of Kerry's upstanding character. Kerry's pastor, for example, describes him as a "great husband, a great friend, [and] a good neighbor." Exhibit A. Numerous friends characterize him as "generous," "a valuable member of his community," "a quiet, unassuming man," and "reliable, trustworthy, and loyal." Exhibit A. Neighbors commonly describe Kerry's willingness to lend a helping hand when it's inconvenient. He is known by others as a supportive, respectful husband to his wife. The outpouring of support and love for Kerry, even in the midst of the current circumstances, demonstrates Kerry's daily behavior is something to be proud of.

After realizing the magnitude of the events that took place on January 6th, Kerry

wholeheartedly regrets his participation. While his intention was not to go inside the Capitol, that's what happened, and he acknowledges he must face the consequences of that uncharacteristic action. He simply wanted to be a face in the crowd and show support, but he now understands the type of rhetoric and false information associated with the day and he is ashamed to be any part of that. If given the chance to do it over, Kerry would've stayed at home with his wife instead of traveling to Washington D.C. He did not go inside the Capitol with the intent to riot, cause damage, or some other tangible harm.

**III.   The Kinds of Sentences Available**

Kerry is eligible for probation. A sentence of incarceration or even a split sentence of incarceration and probation is not appropriate in his case.

### a. The Need for the Sentence Imposed To Promote Certain Statutory Objectives

#### i. To reflect the seriousness of the offense, promote respect for the law, and provide justification for the offense

This Court has the discretion to individualize sentencing based on the facts and circumstances of the case. Based on the facts and circumstances surrounding Kerry's involvement with the January 6th events, and his actual conduct within the Capitol, a term of probation is an appropriate sentence. Kerry did not plan to end up inside the Capitol that day. He never would have expected that his attendance at the rally would have led him to be part of such a horrible day. Again, Kerry came to Washington D.C. with the sole purpose of asserting his First Amendment right to protest. And while many would disagree with his initial choice of that particular political speech, that's not up for debate. *See, e.g., Shurtleff v. City of Boston*, 142 S.Ct. 1583, 1587 (May 2, 2022) ("When the government encourages diverse expression—say, by

8

creating a forum for debate—the First Amendment prevents it from discriminating against speakers based on their viewpoint."). Kerry understands the moment he walked on the Capital steps and inside the Capital, this passed the threshold of what can be called free speech.

In anticipation of the Government asking for a split sentence, Kerry wants to preemptively note that split sentencing should not be permitted in this case. The offense he pleaded guilty to is classified as a Class B misdemeanor, or in other words, a "petty offense," according to 18 U.S.C. § 19. A split sentence is not authorized by 18 U.S.C. § 3551(b) because the plain text of the statute provides for the imposition of a sentence of incarceration or a probation, but not both, for this type of offense. Accordingly, instead of a term of imprisonment, this Court may sentence Kerry to a term of probation of not more than five years for this misdemeanor offense. 18 U.S.C. § 3561(c)(2).

Additionally, a sentence to a period of probation does not minimize the seriousness of this offense. No matter the sentence in this case, Kerry has already sustained unfortunate consequences from his actions. His name and picture have been broadcasted and publicized as associated with the events of January 6th to friends, coworkers, and strangers. In the world of Google, Facebook, Twitter, and the internet as a whole, this will never go away. A simple google of his name, and this will be the first thing that pops up – not his wedding, family, or exceptional work and social history in the community.

### ii. To afford adequate deterrence to criminal conduct/to protect the public from further crimes of the defendant

Kerry does not pose a threat of committing another crime and prison sentence in not necessary to protect the public from further crimes. Kerry has no criminal history, has stable employment, and a loving family. Given his age, the non-violent nature of this offense, and lack

9

of a criminal history, he is placed at a low rate of recidivism. *See, e.g., Recidivism of Federal Offenders Released in 2010*, U.S.S.G. (Sept. 2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210930_Recidivism.pdf.

Giving Kerry a sentence of imprisonment of any kind is unnecessary to promote justice. Even with the January 6th hearings recently presented on prime-time television, members of the Republican House and Senate, Republican Governors, and other deniers still believe the false rhetoric spewed by Trump and his cronies. The denial and shifting of responsibility is astonishing, and this is exactly what these representatives and individuals want—to push their own agenda. No sentence, no matter how harsh, will deter these types of individuals.

But for likeminded people, similar to Kerry, that are generally law-abiding and have zero criminal history, the mere fact that Kerry pleaded guilty and could be facing prison time with his name splattered across the internet, the charge, in itself, *will* make a difference. That difference, however, is not due to a harsh sentence but due to the government and this Court abiding by their ethical, legal, and moral obligations in showing the system does work. In other words, what will act as a deterrence is the willingness of the government to prosecute people that do not commit violence, but were part of an unspeakable act that threatened to undermine the very foundation of our country – an exchange of power free of violence. Studies do suggest, however, that increasing the frequency of prosecution—i.e., the likelihood that law enforcement will detect the crime—can be effective at achieving general deterrence. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 45 (1999) (finding correlations between certainty of punishment and crime rates but not sentence severity and crime rates); Brian A. Jacobs, *The Cost of Affording Deterrence*, Forbes (Nov. 16, 2021),

https://www.forbes.com/sites/insider/2021/11/16/the-cost-of-affording-deterrence (citing Benjamin van Rooij and Adam Fine, *The Behavioral Code: The Hidden Ways the Law Makes Us Better . . . Or Worse* (2021).

A number of other studies suggest that increasing the length of sentences does not achieve significant, if any, general deterrent effects. *See* Sarah French Russell, *Rethinking Recidivist Enhancements: The Role of Prior Drug Convictions in Federal Sentencing*, 43 U.C. Davis L. Rev. 1135, 1153 (2010) (citing Alfred Blumstein et al., *Criminal Careers and "Career Criminals"* (1986)) (concluding that increases in severity of punishment do not produce significant deterrent effects); Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis, in Crime and Justice: A Review of Research* 143 (Michael Tonry ed., 2003); Daniel Nagin, *Criminal Deterrence Research at the Outset of the Twenty-First Century, in Crime and Justice: A Review of Research*, supra, at 1; Daniel Nagin, *Deterrence and Incapacitation*, in The Handbook of Crime and Punishment 345 (Michael Tonry ed., 1988); Lawrence W. Sherman, *Defiance, Deterrence and Irrelevance: A Theory of the Criminal Sanction*, 30 J. Res. Crime & Delinq. 445, 453 (1993); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice 1, 28-29 (2006) (collecting citations).

This Court does not need to sentence Kerry to a prison sentence or split sentence in order to provide for adequate deterrence. The true wrongdoers are the ones that want to continue perpetuating the violent, anti-democratic rhetoric and it's likely that not much this Court can say or do to others will cause them to think differently. Kerry is not one of these individuals, however, and deserves to be placed into a different category.

> iii. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

Many individuals have already been sentenced in connection with the events of January 6th. Looking at the different types of offenders that have been prosecuted, Kerry's conduct places him in line with others that have received probation within this case. And even though this case is unique, the charge and sentence is not. In determining a fair and just sentence, this Court must take into account all defendants around the country charged with this type of offense, and for these offenses, a sentence of imprisonment is extremely rare.

Kerry is not the average offender, either. Again, Kerry has taken full responsibility for his actions. He does not blame anyone else but himself for entering the capitol. He obviously was not alone; he mindlessly followed the crowd down Pennsylvania Avenue and chose to enter the Capitol. But Kerry is not and never has been an extremist. He did not attend the rally to stop the peaceful transfer of power. He did not post on social media or spread rhetoric to others to attack the Capitol. He did not bring a weapon. He was not part of the initial breach of the door he entered into the Capitol from, which we now know was led by people that hoped and wanted to instigate violence. Kerry did not have knowledge of this plan by these other individuals, as he was not part of their groups or social media platforms. At the time, he did not have the ability to understand that he would be a part of history. He simply joined the crowd, which he now understands was a huge mistake that will remain a stain on his reputation for many years.

Regardless of the sentence he receives in this case, Kerry's life will never be the same. His name was circulated all over the news immediately after his complaint was made public. While this case is a misdemeanor, the impact of this charge, plea, and sentence will follow him

12

forever and affect his life. This event will be taught in schools and depicted as an example of how our democracy was threatened, which is rightfully so. Kerry will carry that weight along with everyone else involved. He is a good person that used very poor judgement.

## IV.     Conclusion

This is not a normal mistake, but a criminal one. He entered a guilty plea agreed to by the government that his role and criminal act during this incident constitute a federal misdemeanor offense. While attached to an underlying event that is significantly more serious, his charged offense was parading, demonstrating, or picketing in the Capitol building. His true criminal conduct is low-level and thus should be treated as such. And while this Court should be concerned that a sentence ensures this type of behavior never occurs again, this factor should not be weighed more heavily than the other § 3553(a) factors. For all these reasons, a probationary term is appropriate in this case.

Based on the circumstances surrounding Kerry's limited involvement with the actions of January 6, 2022, his lack of criminal history, and his upstanding character, Kerry Persick asks this Court to sentence him to a probationary period of one year.

Respectfully submitted,

 /s/   J. Joseph Mongaras
J. JOSEPH MONGARAS
Texas Bar No. 24039975

UDASHEN | ANTON
8150 N. Central Expressway
Suite M1101
Dallas, Texas 75206
(214) 468-8100
(214) 468-8104 (fax)

## Certificate of Service

I certify that a true and correct copy of the foregoing document was delivered to the Assistant United States Attorney on June 30, 2022, using the Pacer electronic filing system.

    /s/   J. Joseph Mongaras
J. JOSEPH MONGARAS