**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00485-BAH** |
| **v.** | : | |
| | : | |
| **KERRY WAYNE PERSICK,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.  For the reasons set forth herein, the government requests that this Court sentence Kerry Wayne Persick ("Persick") to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

I.    **Introduction**

The defendant, Kerry Wayne Persick, a 42-year-old investment analyst in Dallas, Texas, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]  ECF No. 37 at ¶ 20.

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On April 22, 2022, Persick pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 7 days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution, is appropriate in this case because Persick: (1) entered the U.S. Capitol Building through the Senate Wing Door with rioters approximately 11 minutes after the Senate Wing Door was first breached, where two adjacent windows had been broken and rioters were climbing through, presumably making him aware of the potential for violence and property destruction; and (2) unlawfully protested throughout U.S. House corridor H159, a staffed corridor where Congressional offices are located and staff were present, and the Crypt before only leaving after he was told of how the news media was portraying the breach of the Capitol.[2]

The Court must also consider that Persick's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the certification vote. Here, Persick's participation in a riot that actually succeeded in halting the Congressional certification combined with Persick's entry into the Capitol and continued protesting from the Senate Wing area to the U.S. House and then the Crypt show that a strictly probationary sentence is not warranted here. Rather, a sentence of 14 days incarceration is both necessary and appropriate in this case.

---

[2] Today, June 30, 2022, the government received final confirmation from the United States Capitol Police that staff members were present at House corridor H159 when Persick and other rioters were in the corridor.

2

II.      **Factual and Procedural Background**

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Persick's conduct and behavior on January 6.

*Persick's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Persick left his home in Trophy Club, Texas  and traveled via airplane from Dallas, Texas to Washington, D.C. to attend the "Stop the Steal" rally. ECF 34 at ¶ 8.  After attending the former President's rally, Persick marched to the Capitol with other protestors.  *Id.* at 9.

At approximately 2:00 p.m., some of the rioters forced their way onto the restricted grounds and unlawfully entered the U.S. Capitol.  *Id.* at 5.   The Senate Wing Door of the U.S. Capitol was first breached by Michael Sparks who jumped through the window over the broken glass:[3]

---

[3] The Government charged Sparks with Civil Disorder and Aiding and Abetting, in violation of 18 U.S.C. §§ 231(a)(3) and 2; Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; and several misdemeanors.   *See United States v. Sparks*, Docket Entry 22, Case No. 1:21-cr-00087 (TJK), (D.D.C. Nov. 10, 2021).  The Court has set trial in the Sparks case for January 9, 2023.  *Id.*, Docket Entry 32 (D.D.C. March 28, 2022).



Figure 1 – Sparks entering the U.S. Capitol through a broken window near the Senate Wing Door.

Persick entered the Capitol Building with others through the Senate Wing Door approximately 11 minutes after Sparks and joined other rioters already unlawfully inside the U.S. Capitol.  *See* Figure 2; *see also* Notice of Filing, ECF No. 40, Exhibit 1 – CCTV footage of the breach of the Senate Wing Door and Persick entering the Capitol.[4] As Persick entered the building he used his company-issued iPhone to record his entry into the U.S. Capitol.  As shown in the photo below, the two windows adjacent to the Senate Wing Door had been broken open.

---

[4] Figures 2-4 are screen captures referenced in Docket Entry 30 as Numbers 7-9.  Figures 5-6 are screen captures referenced in Docket Entry 30 as Numbers 10-11.  Figures 7-8 are screen captures referenced in Docket Entry 30 as Numbers 12-13, and Figures 9-10 are screen captures referenced in Docket Entry 30 as Numbers 14-15.



Figure 2 – Persick entering the Senate Wing Door with other protestors.

Also at this time, as seen in the above photo, rioters were moving throughout the lobby of the Senate Wing Door area.  Persick turned to his right and walked with them past the broken glass on the floor from the smashed-in window and broken furniture.  *See also* Figures 3 and 4.



Figure 3 – Persick and other rioters moving through the Capitol after entering through the Senate Wing Door broken windows.



Figure 4 – Persick moving through the U.S. Capitol as other rioters continue to enter.

From there, Persick walked through a corridor near H159 in the U.S. House of Representative Wing of the Capitol. *See* Figures 5 and 6; *see also* Notice of Filing, ECF No. 40, Exhibit 2 – CCTV footage of Persick in U.S. House corridor H159 OAP. According to the United States Capitol Police, offices and facilities used by the Office of the Attending Physician ("OAP") and by the United States Speaker of the House of Representatives are located in House corridor H159.   An elevator is also located in the corridor.[5]  *See* Figures 5-6 (some rioters apparently reviewing the directory).   On January 6 at 2:30 p.m., OAP staff members were in their offices when the rioters were roaming through House corridor H159.

---

[5] Although the elevator was operational, access to certain floors is controlled/restricted.



Figure 5 – Persick and rioters in the tightly-packed U.S. House corridor H159 near an elevator located in the corridor.



Figure 6 – Persick leaving the corridor as a rioter attempts to remove the elevator directory placard.

After exiting House corridor H159, Persick walked to the Crypt.  *See* Figure 7, Notice of Filing, ECF No. 40, Exhibit 3 – CCTV footage of Persick in the Crypt East; *see also* Figure 8, Notice of Filing 40, Exhibit 4 – CCTV footage of Persick in the Crypt North.



Figure 7 – Persick in Crypt East.



Figure 8 – Persick in the Crypt North area.

During Persick's post-plea interview with the FBI, he stated that while in the Capitol, he called his wife. She told Persick to leave the Capitol and that, according to news media, "it looked bad inside" the Capitol. Persick then walked back to the Senate Door Wing area. Closed-circuit video footage shows Capitol police officers had re-secured the Senate Wing Door with furniture as a barricade and placed furniture against one of the broken Senate Wing windows to block rioters from continuing to enter the Capitol. Other officers directed Persick and other rioters to exit the Capitol through the other broken Senate Wing window. *See* Figures 9 and 10; *see also* Notice of Filing, ECF No. 40, Exhibit 5 – CCTV of the defendant exiting the U.S. Capitol Building through a broken Senate Wing window as directed by Capitol police.



Figure 9 – Persick preparing to exit through a broken Senate Wing window.



Figure 10 – Persick exiting the Capitol building through a broken Senate Wing window.

In total, Persick spent 18 minutes inside the Capitol. ECF No. 34 at ¶ 11.

10

In March 2021, FBI agents sought to interview Persick as part of their on-going investigation.  Persick retained counsel.  On May 17, 2021, Persick's counsel was present for Persick's arrest.  Persick's counsel surrendered Persick's iPhone and informed the agents the iPhone was wiped clean on February 1, 2021, when Persick's employer was acquired by a different company.

*Social Media Posts*

During Persick's post-plea interview in June 2022, Persick stated that he shared some photographs and videos from the January 6 rally and inside the Capitol with close friends and family but did not post photographs or videos on social media.    Persick stated that one of the social media platforms, Facebook, suspended his account after January 6 although he did not post photographs and videos on Facebook.  The government does not have evidence Persick authored social media posts regarding the breach of the Capitol.

*Persick's Interview*

On June 3, 2022, Persick was interviewed pursuant to the terms of the plea agreement. Regarding the iPhone, Persick acknowledged using the iPhone to take a picture of himself outside the Capitol building and video once inside the building.  He stated that during the company ownership transition in February 2021 he wiped the iPhone before returning it to his new employer. The new employer reissued the iPhone to Persick.  Persick attempted to unlock the iPhone using a personal identification number but was unable to do so.

Regarding the "Stop the Steal" rally and his breach of the U.S. Capitol, Persick stated that he flew from Dallas, Texas, to BWI airport in Washington, D.C. to attend the rally.  Persick described his time in the Capitol as "kind of a blur."  He stated that he did not see acts of violence inside the Capitol or people wearing body armor.  He stated people were chanting inside the

Capitol and that he left the Capitol after he spoke to his wife and she told him that "it looked bad inside" the Capitol.  He further stated that a police officer directed him to exit through a window because others were trying to enter the Capitol through the door.  Once outside the Capitol building, Persick heard people say someone had been shot.

Persick stated that he regretted following the crowd to the Capitol and described January 6 as a "sad day."  He further stated, "I am sad that I was associated with it," and regrets traveling to Washington, D.C. to attend the rally altogether.  Persick answered questions regarding other individuals of interest to the FBI.  The interviewing agent noted in her report that Persick "appeared to be genuinely remorseful during the interview."

*The Charges and Plea Agreement*

On May 13, 2021, Persick was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and 40 U.S.C. §§ 5104(e)(2).  ECF No. 1.  On May 17, 2021, he was arrested at his home in Trophy Club, Texas. ECF No. 14.  On July 9, 2021, Persick was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF No. 9.  On April 22, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  ECF Nos. 33-35.  At Persick's Rule 11 hearing he admitted that he knew at the time he entered the U.S. Capitol Building that he did not have permission to do so and that while inside the Capitol he willfully and knowingly paraded, demonstrated, or picketed.  ECF No. 34 at ¶ 12.  By plea agreement, Persick agreed to pay $500 in restitution to the Department of the Treasury.  ECF No. 33 at ¶ 11.

### III.     Statutory Penalties

Persick now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Persick must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class B misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days incarceration.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without

authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Persick's individual conduct, this Court should look to a matrix of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated  sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Persick personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Persick's part is therefore not a mitigating factor in this misdemeanor case, nor does it meaningfully distinguish Persick from most other misdemeanor defendants.

Aggravating factors in Persick's case include his relatively early entry into the Capitol after the initial breach despite undoubtedly witnessing rioters entering through broken Senate wing windows, his 18 minutes spent inside the Capitol, his travel to an area of the House side of the Capitol building where OAP staffers and possibly other Congressional staffers had to shelter in

place and hide in fear during the riot,[6] and his willingness to leave the Capitol only after being informed by his wife that "inside the Capitol looked bad."  The government also acknowledges that there are mitigating factors as well.  They include Persick's almost nonexistent prior contact with the criminal justice system before he was charged in this case, his lack of social media presence praising the rioting on January 6, and his apparently sincere expressions of remorse during his interview with the FBI case agent.

Accordingly, the nature and the circumstances of this offense establish 14 days incarceration and probation are appropriate in this matter.

### B.  Persick's History and Characteristics

As set forth in the PSR, Persick's criminal history consists of a conviction for Reckless Driving in 2000 when he was 19 years old for which he paid a $200 fine.  ECF No. 37 at ¶ 24.  He has been compliant with the conditions of pre-trial release and was cooperative with the FBI when they sought to interview him and considered remorseful by the FBI interviewer.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[7] As with the nature and circumstances of the offense, this factor will

---

[6] *See* https://nypost.com/2021/01/07/capitol-staffers-shown-hiding-for-their-lives-during-siege/(last viewed June 30, 2022).

[7] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

generally support a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy.

16

It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Persick's conduct on January 6, entering the Capitol Building through the Senate Wing Door, parading throughout the Crypt, a restricted hallway, and remaining inside the Capitol for 18 minutes until his wife called him clearly demonstrates the need for specific deterrence for this defendant in the form of 14 days incarceration.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with

Congress.[8] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[9] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed,

---

[8] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[9] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Persick has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long a defendant remained inside, the nature of any statements a defendant made (on social media or otherwise), whether a defendant destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway in which no offices were located.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration.  In *United States v. Spencer*, 1:21-cr-00147-002 (CKK), the defendant pled guilty

to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) in connection with penetrating the Capitol building all the way to the Speaker's suite of offices. Judge Kollar-Kotelly sentenced the defendant to 90 days of incarceration. Likewise, in *United States v. Stackhouse*, 1:21-cr-00240 (BAH), the defendant pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) in connection with penetrating the Capitol building all the way to the Speaker's suite of offices. The Court sentenced the defendant to 14 days intermittent incarceration.

The government acknowledges that House corridor H159 is not immediately recognizable or as a notable area for protestors such as the Speaker's suite of offices and that Persick did not remain in the corridor for an extended period. Nevertheless, House corridor H159 was staffed by OAP staffers sheltering in place at the time Persick and other rioters were in the area. As such, a period of incarceration is warranted.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     THE COURT'S AUTHORITY TO IMPOSE A TERM OF INCARCERATION AS A CONDITION OF PROBATION.

**This Court's Authority to Impose a Sentence of Up to 14 Days of Imprisonment and Probation.**

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Sarko*, No. 21CR591 (CKK), 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (explaining why a split sentence is permissible in a petty offense case); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) ("the Court concludes that a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case."); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555 (RCL), ECF 42 (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510 (CKK), ECF 39 (D.D.C. June 1, 2022) (imposing split sentence). But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised

release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, *e.g.*, for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  S*ee United States v. Stenz*, 21-cr-456 (BAH) ECF 38 (D.D.C. Feb. 17, 2022) (imposing imprisonment under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (BAH) ECF 71 (D.D.C. Feb. 18. 2022) (same); *United States v. Herendeen*, 21-cr-278 (BAH) ECF 87 (D.D.C. Apr. 1, 2022) (same); *United States v. McCreary*, 21-cr-125 (BAH) ECF 46 (D.D.C. Apr. 1, 2022) (same); *United States v. Reed*, 21-cr-204 (BAH) ECF 178 (D.D.C. Apr. 14, 2022) (same); *United States v. Watrous*, 21-cr-627 (BAH) ECF 40 (D.D.C. Apr. 21, 2022) (same); *United States v. Vuksanaj*, 21-cr-620 (BAH) ECF D.D.C. Apr. 29, 2022) (43 (same); *United States v. Heinl*, 21-cr-370 (EGS) (D.D.C. June 2, 2022) ECF 43  (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.   For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Kerry Wayne Persick to 14 days incarceration, 36 months' probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.  Lastly, pursuant to the plea agreement, the government request at the conclusion of the sentencing hearing that the Court dismiss Counts One through Three of the Information.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:      /s/ Michael G. James

24

MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-D.C.)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov